UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Reidar M. Juliussen, Jr.,

                    Plaintiff,

          -v.-

Buchanan Marine, L.P.

                    Defendant.

Civil Action No. 08 Civ. 1463
(DCP)

---

## OPINION & ORDER

[Defendant's Motion for Summary Judgment denied.]

                    Dated: January 6, 2009

Levene, Gouldin & Thompson, LLP (Michael R. Wright and John H. Hartman) for the Plaintiff.

Halloran & Sage LLP (Carl R. Ficks, Jr. and William S. Wilson, II) for the Defendant.


    POGUE, Judge:[1] After falling on board the ship on which he

works, and thereby injuring his right knee, Reidar M. Juliussen,

Jr. ("Juliussen" or "Plaintiff") filed this action for relief under

the Jones Act, 46 U.S.C. App. § 688 (2005),[2] and under general U.S.

---

    [1] Judge Donald C. Pogue of the United States Court of
International Trade, sitting by designation.

    [2] Subsequent to this Plaintiff's injury, in 2006, the Jones
Act was codified as 46 U.S.C. § 30104. Codification of Title 46,
Pub. L. No. 109-304, § 6(c), 120 Stat. 1485, 1510 (2006).

maritime law, against his employer, Buchanan Marine, L.P. ("Buchanan" or "Defendant"). Buchanan operates Juliussen's ship, the Buchanan One ("B One").

Currently before the court is Buchanan's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56 and Loc. Civ. R. 56.1. Buchanan alleges that both the primary duty doctrine and the effect of Plaintiff's own negligence require the court to conclude that, as a matter of law, Buchanan cannot be held liable for Plaintiff's injuries. Further, Buchanan claims that Juliussen has failed to provide evidence that a dangerous or unseaworthy condition caused his injuries.

For the reasons explained below, Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

The court begins with a summary of the relevant facts from the record presented -- including a summary of Juliussen's work record, the condition of the B One, the March, 2005 accident, and relevant events following the accident. In analyzing this record, "[Juliussen's t]he evidence . . . is to be believed, and all justifiable inferences are to be drawn in [Juliussen's] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). As such, for the purposes of deciding the instant motion, the court assumes as true all facts identified from Plaintiff's deposition, discovery, and other filings.

This record establishes that Juliussen, now around 53 years of age, works as a Mate[3] for Buchanan. (See Def.'s Summ. J. Ex. C, Juliussen Dep. 71.) As of 2005, Juliussen had worked in the marine industry for over 32 years. (Pl.'s Ex. 3, Admis. ¶ 1.) In 1973, he began this career, (Def.'s Summ. J. Ex. C, Juliussen Dep. 15) and, in 1987, he attended sea school in St. Petersburg, Florida and took the Coast Guard exam to obtain a license. (Id. 29.) This license identifies him as "an officer of the vessel that [he] serve[s] on"

---

[3] A ship's "Mate" is the "second-in-command officer on a merchant vessel." Black's Law Dictionary 1066 (9th ed. 2009). Juliussen's duties as Mate include: "be[ing] responsible for the safe navigation of the tug while on watch"; "assist[ing] the Captain updating charts with information from the daily notice to Mariners [while on watch]"; "enter[ing] in movements of the tug into the daily log while on watch"; "operat[ing] the radar, depth finder, GPS and towing machine [while on watch]"; "stand[ing] two six-hour watches per day (noon to 6 p.m. and midnight to 6:00 a.m.)"; "supervis[ing] crews and report[ing] personnel problems to the Captain [while on watch]"; "assist[ing] experienced deckhands in breaking in new deckhands [while on watch]"; "verify[ing] company-owned mooring coordinates [while on watch]"; and "report[ing] any and all damage or problems with Buchanan [] moorings [while on watch]." (Ex. to Pl.'s Counterstatement of Material Facts ("Pl.'s Ex.") 3, Pl.'s Resp. to Req. for Admis. ("Admis.") ¶¶ 4-12.) As to the safety of the tug in particular, Juliussen is "responsible for the safety of the deckhands" (Ex. to Statement of Material Facts on Def.'s Mot. for Summ. J. ("Def.'s Summ. J. Ex.") C, Juliussen Dep. 71) and thus "if [he] see[s] something that's hazardous on the vessel . . . [he] . . . direct[s] somebody to fix it." (Id. 78.) It is his duty to "verify that all safety equipment is on board and is operational." (Id. 75.) Moreover, while on watch as Mate, Juliussen "evaulate[s] personnel performance", "enforce[s] company policies on board the tug," "report[s] damages to [his] tug and scows," and "instruct[s] deckands on how to make repairs . . . ." (Id. 77)

and thus he "outrank[s] the deckhands."[4] (<u>Id.</u> 200.)

## I. Juliussen's Work at Buchanan

Juliussen originally began working for Buchanan in 1985, where he served as a deckhand until 1990. (<u>Id.</u> 20.) Although he left Buchanan in 1990, (Pl.'s Ex. 1, Juliussen Dep. 26) he returned in spite of his concern that Buchanan's vessels were, and continued to be, "unseaworthy." (<u>Id.</u>; Def.'s Summ. J. Ex. C, Juliussen Dep. 25.)[5] But he never felt his safety was jeopardized by the unseaworthy vessels. (<u>Id.</u> 26.) Upon returning to Buchanan, Juliussen was made a Mate, and has worked as a Mate at Buchanan since his return. (Def.'s Summ. J. Ex. C, Juliussen Dep. 9.)

As a Mate, Juliussen's job involves relieving the Captain from steering responsibilities in six-hour intervals, Juliussen's hours being fixed at noon to six p.m. and midnight to six a.m. (<u>Id.</u> 11.) During these six-hour shifts on watch, Juliussen, as the Mate, is the "master and supervisor of [his] tug" and he has "responsibility for the safe navigation of the tug." (<u>Id.</u> 75.)

While Juliussen is off watch, during the Captain's six-hour shifts, the Captain is in charge of the vessel. During this time,

---

[4] A "deckhand" is a "member of a ship's crew who performs manual labor." <u>American Heritage Dictionary of the English Language</u> 484 (3d ed. 1992).

[5] To Juliussen, a boat is unseaworthy if it is "not watertight" and "not good in rough weather." (Pl.'s Ex. 1, Juliussen Dep. 147.) Juliussen has worked on all of Buchanan's vessels. (<u>Id.</u>)

Juliussen generally does not give the deckhands orders, and, in any event, usually does not clean or repair the boat. (<u>Id.</u> 186-87.) However, to some extent while off watch, Juliussen is "still in service to the vessel." (<u>Id.</u>) For example, "[i]f [he] saw two deckhands doing something improper or unsafe while off watch, [he has] a duty as a [M]ate to remedy what those deckhands were doing improperly or unsafely." (<u>Id.</u>) To fulfill his duty, he either will direct a deckhand to fix the problem or fix the problem himself. (<u>See</u> <u>id.</u>)

However, not all hazards on the tugboat are "in [Juliussen's] hands to correct." (Ex. to Def.'s Reply to Pl.'s Objection to Mot. for Summary J. ("Def.'s Reply Ex.") 1, Juliussen Dep. 190.) It is not Juliussen's job to perform repairs or maintenance on the boat. (<u>Id.</u>) The chief engineer is primarily responsible for boat repairs. (Def.'s Summ. J. Ex. C, Juliussen Dep. 70.) If Juliussen sees a potentially hazardous condition, whether on or off watch, "all [he] can do[] [is] report it, bring it to the attention –– depending on what department it is, either the deckhand, the chief or the [C]aptain." (Def.'s Reply Ex. 1, Juliussen Dep. 191.) Instead, it is the Captain's responsibility to report the condition of the vessel. (Def.'s Summ. J. Ex. C, Juliussen Dep. 59.) Because he understood reporting to be the Captain's duty, Juliussen never complained to shoreside personnel about any condition on any

Buchanan vessel. (<u>Id.</u>; <u>see also</u> <u>id.</u> 139.)[6]

Previous to the accident at issue in this case, Juliussen had fallen on the stairs of nearly "every Buchanan [] boat that [he] served on," both from 1985 through 1990 and from 1997 to present day, but never sustained injury on those falls. (Pl.'s Ex. 1, Juliussen Dep. 36; Def.'s Reply Ex. 1, Juliussen Dep. 40.) After falls on the boats B Three and B Ten, he recalls complaining to the crew--the deckhands, the chief engineer, and the Captain--but he never complained about the stairs of these vessels to shoreside personnel. (Def.'s Reply Ex. 1, Juliussen Dep. 39-40, Pl.'s Ex. 1, Juliussen Dep. 41-42.) In particular, on the B Ten, Juliussen fell because

> the stairs were dark. You really can't get your whole feet onto the treads of the stairs. You have to work on -- you have to come down on an angle on them. You can't just walk normal stairs like you do in your house. Most seagoing vessels are like that.

(Pl.'s Ex. 1, Juliussen Dep. 42.) However, Juliussen is familiar

---

[6] "[I]t [is Plaintiff's] practice to report any unsafe condition onboard the tugboat to the Captain upon becoming aware of the unsafe condition"; "the Captain [] is then supposed to report them to the company and the company is then supposed to arrange for same to be corrected but they rarely do so." (Pl.'s Ex. 3, Admis. ¶¶ 14-15.) Correcting promptly the existence of all potentially hazardous conditions is "not a specified duty and responsibility as a Mate . . . ." (<u>Id.</u> ¶ 14.) "[I]t is not [his] responsibility to advise Buchanan [] in writing or otherwise of any hazardous conditions." (<u>Id.</u> ¶ 22.)
 Juliussen admits that he was never told by Buchanan nor any Captain that he could not speak to shoreside personnel about conditions on a vessel. (Def.'s Summ. J. Ex. C, Juliussen Dep. 60.)

with these types of stairs "from [his] years in the marine industry," (id.) and deems them "just a part of the business." (Def.'s Summ. J. Ex. C, Juliussen Dep. 52.) He does not consider unusual the amount of falling on Buchanan vessels. (Id. 51.)

Every spring, including the Spring of 2005, Buchanan conducts day-long safety meetings where "they would discuss things like how to handle lines and everything." (Id. 61-62.)[7] Buchanan also provides its employees, including Juliussen, with its "Policy Manual." (Id. 73; see also Def.'s Summ. J. Ex. G, Policy Manual 2-7.) Prior to the relevant accident, Juliussen had received and was familiar with this manual. (Def.'s Summ. J. Ex. C, Juliussen Dep. 73.) Among the manual's provisions, relevant to the current litigation, the manual requires that

> In event of an accident or an injury aboard the vessel or damage to, or caused by the vessel, the following procedures shall be followed: . . . Contact dispatch and verbally report the accident, injuries, damage and follow dispatcher's instructions. [] Make a factual log entry. Do not speculate. [] Follow precisely Buchanan [] Accident Reporting Policy.

(Def.'s Summ. J. Ex. G, Policy Manual 5 (emphasis in original); see also Def.'s Summ. J. Ex. C, Juliussen Dep. 78 (the policy manual requires that accidents, injuries and damages should be recorded as a factual log entry).) To Juliussen's knowledge, Buchanan does not require that a seaman be on watch to make such a log entry. (Pl.'s

---

[7] In 2005, Jules Lloyd served as the safety director. (Id. 62.)

Ex. 1, Juliussen Dep. 80.)  Furthermore, the manual provides:

> 1.4 WORKING ATTIRE [] The following is MANDATORY WORKING
> ATTIRE: . . . Work shoes (whenever on watch <u>or</u> on deck)
> (See section 1.4.1) . . . .
>
> 1.4.1 COMPANY WORKSHOE POLICY [] Proper Footwear for
> Marine Personnel [] Numerous incidents have brought to
> light the need for personnel on board vessels to wear the
> proper footwear.  The intent is to prevent slips and
> falls on wet decks and to provide better support for the
> feet and ankles. [] All personnel assigned to duty on
> board Buchanan [] vessels will wear the following
> footwear: [] 1. A leather work boot with the upper
> portion extending at least two inches (2") over the top
> of the ankle. [] 2. A non-slip, oil resistant sole. [] 3.
> Waterproof or water-resistant." [] SNEAKERS ARE NOT
> ACCEPTABLE FOOTWEAR.

(Def.'s Summ. J. Ex. G, Policy Manual 6-7 (emphasis in original);

<u>see also</u> Def.'s Summ. J. Ex. C, Juliussen Dep. 192-93 (the leather

shoes are required "so you don't slip on oil" because "[y]ou have

better traction" and "[m]ore ankle support").)

## II. The B One

For the four years leading up to and on the day of his

accident, Juliussen worked as Mate on the B One. (Pl.'s Ex. 1,

Juliussen Dep. 26.)[8] During these years prior to the accident,

Juliussen considered the B One in particular to be unseaworthy.

(Pl.'s Ex. 1, Juliussen Dep. 26 ("The doors are all sprung, you

can't get them watertight. The portholes were -- you can't get them

tight, they would leak. The wheelhouse windows leaked."), 27 ("She

had a leak into the line locker from the fuel tank up on the

---

[8] Owen Moriarty served as the Captain on the B One. (Def.'s
Summ. J. Ex. C, Juliussen Dep. 12.)

bow."), 141 ("on the upper deck in the engine room there is a grating there that's loose that moves when you step on it"; "the hatches aren't watertight"; "[t]he boat was designed with no deck drains, so when she does take on water it just puddles in the boat. Doesn't drain off. Doesn't go into the engine room where it can be pumped up out the side, it just fills up in the galley and then goes out the door into the engine room").)[9]

Moreover, during this time period, Juliussen climbed and descended the B One stairwell, leading from the wheelhouse[10] to the galley,[11] restroom, and engine rooms, around eight times a day. (Def.'s Summ. J. Ex. C, Juliussen Dep. 68, 69.) But, up to that point, he had never injured himself on the B One nor had he filled out a report regarding the stairwell. (Id. 51.) Notably, the condition of the stairwell has remained the same from the four years prior to the accident to present day. (Id. 66.)

The B One stairs have approximately twelve steps and are equipped with two handrails. (Id.) One handrail is located on the left-hand side that reaches the length of the stairwell, *i.e.*,

---

[9] Juliussen admits, however, that such problems did not contribute to his accident. (Id. 141.)

[10] The "wheelhouse" or "pilothouse" is "[a]n enclosed area on the deck or bridge of a vessel from which the vessel is controlled." Webster's II New Riverside University Dictionary 892, 1313 (1988).

[11] The "galley" is the ship's kitchen. Webster's II New Riverside University Dictionary 516-17.

about twelve feet, and a two-foot long "grab" bar is located overhead at the bottom of the stairs. (Id. 50-51, 66.) Although narrow, the stairs are "typical of those found on tugboats." (Id. 131.) Juliussen cannot fit his entire foot onto a stair step when facing forward, that is, away from the stairs. (Id. 118.)

The B One's stairwell has an approximately two-foot long fluorescent light fixture at the top of the stairs. (Id. 54-55.) However, this light fixture does not have a fluorescent bulb installed therein, (id. 55) as the brightness of the bulb would "blind the guys in the wheelhouse"; it would affect the steering and make it impossible to see out the windows, and thereby threaten the safety of the vessel. (Id. 56-57.) Thus, to provide some light in the stairwell, Buchanan instead plugged into the light fixture a small "nightlight" with an on/off toggle switch. (Id. 55, 57-58.) Juliussen did not install this light and has never even touched it. (Id. 57, 58.) On the steel stair steps, painted black, Buchanan placed raised diamond plating to provide foot tread or traction. (Id. 85-86, 115.) At the time of the accident, these treads were "a little worn." (Id. 134.)

Much of the time, Juliussen would descend the stairs facing at a backward angle, that is, facing the rail and the stairs, because he "could get more of [his] feet into the rung" of the stairs. (Id. 52, 53.) Although he notes that one cannot use the grab bar when facing the stairs, he considers descending the stairs facing

10

backward to be safer than facing forward. (Id.) Indeed, Juliussen has never fallen while descending the stairs backward. (Id. 54.)

Nonetheless, Juliussen has fallen "[n]umerous times" while descending the stairs facing forward. (Id. 50 ("I've fallen a lot. I've just -- like I said I'm not the only person that has fallen on that boat. That's why they have two handrails on it.").) Juliussen attributes his falling to the lack of adequate lighting in the stairwell as well as the worn condition of the diamond treads. (Id. 54 (when asked why he fell all of those times on the B One, he replied that it was "[j]ust the way the stairs are designed and stuff: it's dark" though "not completely dark"), 106-07 (the stairwell needed more lighting "[s]o you can see a little better"), 133 (the stairs were a "slip hazard").) Juliussen felt that Buchanan should have taken measures to make the stairs safer, including applying "nonskid paint [that has sand in it]" and replacing the treads. (Id. 133.) He has seen other vessels with rough fiberglass "orange stairs [and reflective] tape." (Id. 136.)

Juliussen did tell others, including the Captain, about these problems with the lighting, the treads, and the stairwell in general, "[i]n passing" by way of "[i]dle conversation through the years." (Id. 115, 139.) But he never formally reported the problems to the Captain or to shore personnel. (Id. 57, 59, 61,

116, 134, 135, 192.)[12]    Nor does he know if the Captain ever
reported the stairwell issues based upon the "idle chatter." (Id.
144.)    Although he had known about the stairwell problems for
several years before his accident, Juliussen never warned the
deckhands. (Id. 135-36.)

## III. The March 27, 2005 Accident

While off watch, as Mate for B One, on Sunday evening, March
27, 2005, (Def.'s Summ. J. Ex. C, Juliussen Dep. 5, 9, 10, 12, 68)
Juliussen cleaned and vacuumed his stateroom in preparation for the
Monday crew change and headed to the engine room to stow the vacuum
cleaner. (Id. 88, 90; Pl.'s Ex. 1, Juliussen Dep. 102.)   The steps
were dry, with no grease or oil on them, (Def.'s Summ. J. Ex. C,
Juliussen Dep. 118) and Juliussen, not distracted, in a hurry, or
under the influence of any drug of any kind, descended forward down
the steps with his left hand on the handrail and his right hand
holding the vacuum. (Id. 91-92; Pl.'s Ex. 1, Juliussen Dep. 102.)
Approximately halfway down the stairs, as he could not "get [his]
whole foot [onto] the stairs the way they're designed," (Def.'s
Summ. J. Ex. C, Juliussen Dep. 118) Juliusssen's right foot slipped
on a step, he hit his back on the stairs, and his right knee struck

---

[12] In contrast, he <u>has</u> reported other conditions to the
Captain: "a plexiglas window . . . in the wheelhouse"; "a busted
window"; "the hatches"; and "the leak." (Def.'s Reply Ex. 1,
Juliussen Dep. 191.)   Juliussen claims that these problems have
not been speedily attended to, if at all, despite his reports to
the Captain. (Id.)

the doorknob of the galley door. (Id. 95, 97, 99-100.)[13] As a result of his contact with the doorknob, Juliussen sustained a ruptured quadriceps tendon of the right knee. (Id. 100; Pl.'s Ex. 2, Pl.'s Resp. to Interrogs. ("Interrogs.") ¶ 1.)

At the time he fell, Juliussen was wearing low-top sneakers that had rubber, rather than nonslip, soles. (Def.'s Summ. J. Ex. C, Juliussen Dep. 87, 193.) He did not wear leather boots because he was not on duty and not outside. (Pl.'s Ex. 3, Admis. ¶ 16.) The sneakers, though about a year old, still had tread on them, and Juliussen wore them because he, along with others in the industry, believed that the sneakers had better traction than the company-sanctioned leather boots. (Def.'s Summ. J. Ex. C, Juliussen Dep. 87, 194.) Juliussen cannot remember whether the nightlight was on or off. (Id. 57-58.) Though the galley lights were on,[14] Juliussen did not go down first to open the galley door as he felt it would not have shed enough light on the stairs to make a discernable difference, (id. 94, 95) except with regard to the bottom three steps. (Id. 95.) Further, the galley door did not have a latch allowing Juliussen to prop the door open short of asking a deckhand

---

[13] Because his hand grasped the handrail, he was able to partially stop himself from falling. (Id. 98.) Juliussen admits that his foot could have fit on the stair steps had he descended the stairs backward, (id. 118) however he could not have faced backward while carrying the vacuum. (Id. 98.)

[14] "There was a light coming through the . . . window on the bottom that illuminate[d] the bottom part of the stairs." (Id. 93.)

to hold it for him. (<u>Id.</u>; <u>see also</u> <u>id.</u> 108 (there were "options" available to him to "light up the stairwell better than [he] thought it was lit" but he did not use them).) Moreover, Juliussen could not have held a flashlight as both his hands were full. (<u>Id.</u> 98-99.)

Eric Chase, the deckhand on duty at the time, and Steve Bayman, the deckhand on standby, (<u>id.</u> 85) were both in the galley. (Pl.'s Ex. 4, Supplemental Accident Report 2.) Hearing Juliussen fall, Chase opened the galley door, helped Juliussen to the galley table, and iced Juliussen's knee. (Def.'s Summ. J. Ex. C, Juliussen Dep. 96, 103.) While on the galley table, Juliussen filled out an accident report on form CG-2692. (<u>Id.</u> 111; <u>see also</u> Def.'s Summ. J. Ex. H, Accident Report.)[15] Juliussen made no mention, in said report, of inadequate lighting, the lack of skid-resistant material on the stair steps, or any other concern about the safety of the stairwell. (Def.'s Summ. J. Ex. C, Juliussen Dep. 110-11; Def.'s Summ. J. Ex. H.)[16] Thereafter, Juliussen returned to his stateroom

---

[15] Juliussen wrote, in his accident report, that "[w]hile walking down the stairs [he] fell and hit the door knob to the galley and [] Chase helped [him] to [the] galley table." (Def.'s Summ. J. Ex. H, Accident Report 2.)

[16] He did not make a log entry because Captain Moriarty was on watch at the time. (Pl.'s Ex. 1, Juliussen Dep. 79.) However, he did notify the Captain about the accident, assuming that the Captain made the entry. (<u>Id.</u> 81.) Juliussen cannot recall if he made a log entry that night when he was again on watch. (Def.'s Summ. J. Ex. C, Juliussen Dep. 83.)

to sleep, stood watch on his final shift,[17] and departed the B One around 7 a.m. at Port Washington. (Def.'s Summ. J. Ex. C, Juliussen Dep. 103.)[18]

## IV. Following the Accident

A little less than one month following the accident, at safety director Lloyd's request, Juliussen prepared a supplemental accident report that his wife typed and subsequently faxed to Buchanan from her workplace.[19] (Pl.'s Ex. 1, Juliussen Dep. 113, 114, 116-17; see also Pl.'s Ex. 4, Supplemental Accident Report 1.) This report contained more detailed information as to the safety hazard posed by the stairwell as well as medical treatment for Juliussen's knee.[20]

---

[17] While he was on watch, the stairs remained in the same condition, but Juliussen did "nothing" to fix the situation or warn the crew. (Def.'s Summ. J. Ex. C, Juliussen Dep. 135-36.)

[18] Juliussen admits that Captain Moriarty, on watch, did not violate any navigation rules and neither navigation nor steering contributed to the fall. (Id. 132-33, 144.) Nor did wind or weather play a part in the accident. (Pl.'s Ex. 3, Admis. ¶ 33.)

[19] At that point, Juliussen had not yet retained his wife's employer as his attorney.

[20] The supplemental report read, in part:

I was going down the stairs from my room to the galley (the stairs have no light, it was dark and the stairs are painted black). My hand was on the hand rail, I lost my footing and fell down 3 or 4 steps landing at the bottom with [my] back against the stairs and with my right knee jammed into the door knob. I reached over my knee with my right hand and opened the door to the galley. I got up and when I started to walk into the galley I noticed my knee was already swelling.

After surgery and physical therapy, Juliussen continues to work as Mate on the B One, which still has many of the same unsafe conditions of which Juliussen complains, including those of the

[] Chase and [] Bayman were in the galley at the time. [] Chase was standing on the other side of the door getting ready to open it when I opened the door. I sat down and [Chase] brought me ice for my knee. I then went back to my room and laid down with ice on my knee.

[Captain] Moriarty also heard me fall down the stairs . . . .

I arrived home on Monday and my knee was swollen and I was unable to lift my right leg. I continued to apply ice to the knee Monday. On Tuesday the knee was still swollen and I was still unable to lift my right leg. I was able to stand and walk but my knee kept giving out on me so I scheduled an appointment with my family doctor, Dr. Eder.

I saw Dr. Eder on Wednesday, April 30th [sic] and he advised that due to the swelling he was unable to determine what, if anything, was wrong with the knee and that x-rays couldn't be taken until the swelling had subsided. He advised me to keep the leg wrapped with an ace bandage and to return in approximately a week after the swelling had gone down.

As I was able to walk and the only difficulty I had was the inability to raise my leg, I went to work the week on April 4th. As Dr. Eder advised I kept my knee wrapped. I had some problems with my knee giving out and the inability to raise my leg continued. I called my wife on Wednesday and advised that the swelling had started to go down and to make an appointment with [] Dr. Eder for Tuesday when I was home. I saw Dr. Eder again on Tuesday, April 12th and he scheduled me for an MRI on April 14th. On the evening of the 14th Dr. Eder's office called and advised that the MRI indicated a ruptured tendon and advised that they had scheduled an appointment for Monday April 18th with an orthopedic surgeon at noon.

(Pl.'s Ex. 4, Supplemental Accident Report 2, 3.)

stairwell to the galley. (Def.'s Summ. J. Ex. C, Juliussen Dep. 143, 151.) He can climb and descend the stairs; however, now he only descends the stairs facing backward and has not fallen again. (Id. 151, 156.)[21] According to his doctor, Juliussen will likely, in the future, develop arthritis of the right knee. (Id. 151.)[22]

On February 11, 2008, Juliussen filed this action against Buchanan. As noted above, his complaint asserts negligence under the Jones Act, 46 U.S.C. App. § 688, and breach of warranty of seaworthiness under general U.S. maritime law. To remedy Buchanan's alleged wrongs, Juliussen asks for damages amounting to approximately $717,000 for: "physical pain and suffering including physical disability, disfigurement, impairment, and inconvenience, and the effect of the plaintiff's injuries on the normal pursuits and pleasures of life"; "mental anguish and feelings of economic insecurity caused by disability"; "income lost in the past"; "impairment of earning capacity or ability in the future, including impairment in the normal progress in the plaintiff's earning

_____

[21] He moves the vacuum up and down the stairs by placing it over the rail and lowering it down with a cord. (Id. 156.)

[22] As a result of the injury, Juliussen sustained "resulting scarring and disfigurement and pain and suffering from the time of the accident until the present and pain and suffering in the future." (Pl.'s Ex. 2, Interrogs. ¶ 1.) Furthermore, "[t]he nature of the injury sustained and the continuing pain, achiness and discomfort which he experiences[,] and which increases as a result of sustained physical activity such as climbing up and down stairs which make it more difficult for [P]laintiff to perform his duties[,] causes [P]laintiff to believe that such will result in a diminution in earning capacity." (Id. ¶ 12.)

capacity due to his physical condition"; and "medical expenses."
(Compl. 5.)

Buchanan, on April 11, answered, asserting various affirmative
defenses including, among other things, the primary duty doctrine
and Plaintiff's negligence as sole proximate cause of his damages.[23]
Subsequently, Buchanan moved for summary judgment, arguing that, as
there is no issue of material fact in dispute, the primary duty
doctrine and Plaintiff's own negligence, as well as Plaintiff's
failure to proffer evidence that an unseaworthy condition existed
on the B One, absolve Defendant, as a matter of law, of any
liability in this action.

## STANDARD OF REVIEW

In order to obtain summary judgment, Buchanan, as movant, must
demonstrate "that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S.
317, 325-27 (1986). The court must consider in its analysis
"whether the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law." Anderson, 477 U.S. at 251-52. "A
fact is material if it might affect the outcome of the suit under
the governing law." SCR Joint Venture L.P. v. Warshawsky, 559 F.3d

---

[23] Defendant also brought a counterclaim for negligence.
The counterclaim is not currently at issue here.

133, 137 (2d Cir. 2009) (citation and quotation marks omitted).

Once the movant establishes "that there is an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party. Celotex Corp., 477 U.S. at 325. In discharging this burden, a plaintiff "must come forth with evidence to allow a reasonable jury to find in [his] favor" on each of the elements of his *prima facie* case. Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008); see also Celotex Corp., 477 U.S. at 322-23. The nonmovant must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

The court will draw all factual inferences in favor of the party against whom summary judgment is sought and view the factual assertions in materials such as exhibits and depositions in the light most favorable to the nonmovant. Anderson, 477 U.S. at 255; Runner v. N.Y. Stock Exch., Inc., 568 F.3d 383, 386 (2d Cir. 2009). However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citation omitted). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . or based on speculation." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citing Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996) ("Though we must accept as true the allegations of the party defending against the

summary judgment motion, drawing all reasonable inferences in his favor, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.") (citations omitted); Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.")). See also Anderson, 477 U.S. at 249-50 (nonmovant cannot survive summary judgment by proffering evidence that "is merely colorable, or is not significantly probative.") (citation omitted); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.") (citations omitted).

## DISCUSSION

The court will consider, in turn, each of the three issues raised by Buchanan's motion: (1) whether there is sufficient evidence to require a trial regarding Buchanan's negligence under the Jones Act; (2) whether there is sufficient evidence to require a trial regarding Juliussen's unseaworthiness claim; and (3) whether the primary duty doctrine bars Plaintiff's claims.

### I. Negligence Under the Jones Act

The first specific issue presented is whether Buchanan has established that it is not liable to Plaintiff for negligence and

is therefore entitled to judgment as a matter of law. Specifically, the court must determine whether any genuine issues of material fact exist as to whether Defendant breached its duties under the Jones Act to provide and maintain a reasonably safe workplace, and whether such breach played any part in causing Plaintiff's injuries.[24]

Initially, in order to establish a *prima facie* case for negligence under the Jones Act, Juliussen must demonstrate, by a preponderance of the evidence, that he was, at the time of the injury, a seaman, an employee of Buchanan, and acting within the scope of his employment. See Chandris, Inc. v. Latsis, 515 U.S. 347, 354 (1995) ("The Jones Act provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'") (citation omitted).[25] Second, Juliussen must prove,

---

[24] The Jones Act provides, in pertinent part, that "[a]ny seaman who shall suffer personal injury in the course of his employment may" bring a cause of action against his employer. 46 U.S.C. App. § 688(a). The Jones Act incorporates the Federal Employers' Liability Act ("FELA") by reference. Wills v. Amerada Hess Corp., 379 F.3d 32, 47 n.8 (2d Cir. 2004.) The purpose of the Jones Act, when enacted, "was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty." Atl. Sounding Co. v. Townsend, 129 S. Ct. 2561, 2570 (2009) (quoting The Arizona v. Anelich, 298 U.S. 110, 123 (1936)). "Its purpose was to enlarge that protection, not to narrow it." Id. (quoting Anelich, 298 U.S. at 123).

[25] While the parties agree that Juliussen was a seaman and a Buchanan employee, it is not entirely clear whether they agree that he acted within the scope of his employment while carrying the vacuum down the stairs. Resolution of the "scope of employment" issue is best left to the jury. See Goldwater v. Metro-North Commuter R.R., 101 F.3d 296, 298 (2d Cir. 1996). The

also by a preponderance of the evidence: "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." Diebold v. Moore McCormack Bulk Transp. Lines, Inc., 805 F.2d 55, 58 (2d Cir. 1986) (citation and internal quotation marks omitted). A dangerous condition is one that is unsafe or hazardous, creating the potential for injury-causing accidents to occur. See O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 66 (2d Cir. 2002) (finding that manually lifting steel forms alone, a task ordinarily performed by a crane, constitutes an "unreasonably dangerous activity"); see also Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 905 (6th

---

Second Circuit has explained "scope of employment," in the context of the FELA and the Jones Act, as "within the limits of h[is] employment duties, attempting to further h[is] employer's interests." Gallose v. Long Island R.R., 878 F.2d 80, 84 (2d Cir. 1989). Plaintiff claims that he carried the vacuum down the stairs to return it to the galley after cleaning his room pursuant to Buchanan policy. Defendant argues that, although at the time Juliussen fell he was "off watch," nevertheless "Juliussen is not relieved of his obligations as a ship's officer and would address any unsafe condition he discovered while off watch." (Mem. in Supp. of Def.'s Mot. for Summary J. ("Def.'s Mem.") 2-3; see also id. 19 (Juliussen was "under a continuing duty to exercise due care to maintain safe conditions aboard the vessel and [was] injured as a result of the breach of this duty"; id. 20 (Juliussen "was still in service to the [B] One vessel while off duty").) The court need not address the "scope of employment" question here. Furthermore, the court does not address the question of damages as neither of the parties disputes that Juliussen sustained injuries.

Cir. 2006) (holding that spills in a vessel's kitchen are reasonably foreseeable, and thus holding that evidence of missing grease mats and containers with handles, or otherwise necessary gear, created a genuine issue of material fact whether a deficiently-equipped kitchen constituted an unsafe working space and dangerous condition).

### A. Parties' Arguments

Moving for summary judgment, Buchanan argues that nothing in the B One's stairway presented a "dangerous condition," and that Buchanan consequently cannot be held liable for negligence in Plaintiff's action. (Def.'s Mem. 11.) Buchanan maintains that:

> The stairway was and continues to be safe and reasonably fit for seamen to move between levels on the [B] One. . . . [Plaintiff] admits that the stairway in the [B] One is typical of any other tugboat stairway and that nothing in the stairway changed over the last four years leading up to his fall on March 27, 2005, during which he traveled up and down the stairs approximately 7,280 times. This does not even include the times he went up and down the same stairs on the [B] One from 1997 to 2001 or from 1985 to 1990.

(Id. 11-12.) According to Buchanan, these facts absolve it of liability for Juliussen's injuries, as "[a] shipowner will not be liable when an injured employee fails to establish that the allegedly dangerous condition was different from what a seaman would ordinarily and reasonably expect to find." (Id. 12 (citing Lombas v. Moran Towing & Transp. Co., 899 F. Supp. 1089, 1095 (S.D.N.Y. 1995), aff'd, No. 95-9034, 1996 U.S. App. LEXIS 12339 (2d Cir. May 29, 1996)).)

Buchanan further denies that any failure to correct the alleged dangerous condition constituted negligence as it claims Juliussen never provided Buchanan with any notice. (<u>Id.</u> 14.) Buchanan argues that Juliussen "never complained of or reported any dangerous conditions in the stairway to the Captain of the [B] One or to Buchanan [] management personnel, including at any annual safety meetings, even though he knew of these conditions for at least four years prior to his fall." (<u>Id.</u>)

Finally, Buchanan argues that it did not proximately cause Juliussen's injuries because Plaintiff's own actions were the sole and proximate cause of his injuries. (<u>Id.</u> 15-16.) Buchanan first asserts that Juliussen, "well aware of the conditions in the stairwell," failed to do anything about them even though he was responsible for correcting any potential hazardous conditions. (<u>Id.</u> 15.) Buchanan also argues that "Juliussen's injuries are due entirely to his own negligence" as he failed to exercise reasonable care in descending the stairway. (<u>Id.</u> 13.) According to Buchanan, Juliussen "knew of . . . safer ways" to climb down the stairs, *e.g.,* "backwards facing the stairs/handrail where he can get his entire foot on each stair" while lowering the vacuum cleaner "outside over the rail," but failed to employ such methods. (<u>Id.</u>) Juliussen also allegedly disregarded company policy by not wearing "shoes with non-slip soles." (<u>Id.</u>)

In response, Plaintiff argues that issues of material fact

exist as to (a) whether Defendant breached its duty to provide a reasonably safe workplace by not providing adequate lighting in the stairwell, and (b) whether such failure to provide adequate lighting played any part in causing Plaintiff's fall and injuries. Plaintiff asserts that the B One was designed and/or constructed to fit "a significant and adequately sized light source at the top of the stairs," arguing that the intentional removal of the original bulb and substitute installation of a nightlight, which he "had absolutely nothing to do with," "created a dangerous condition whereby there was inadequate lighting at the top of the stairwell." (Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 6-7.) Though also complaining of Buchanan's failure to provide safer, non-skid stair steps, Juliussen particularly emphasizes the stairwell's inadequate lighting and Buchanan's failure to remedy it. Plaintiff asserts that it was an "open and obvious" dangerous condition "readily discernable to the defendant" which put Buchanan on "constructive notice if not actual notice" of the condition's existence. (Id. 7.)

Lastly, Plaintiff argues that, under the Jones Act's relaxed causation standard, a genuine issue of material fact exists as to whether Buchanan's failure to provide adequate lighting played a part in causing his injuries. (Id.)

## B. Analysis

"[I]n Jones Act cases, the right of the jury to pass upon the question of fault and causation must be most liberally viewed." Oxley v. City of New York, 923 F.2d 22, 25 (2d Cir. 1991) (citation and quotation marks omitted). A plaintiff is entitled to go to the jury if "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." Rogers v. Mo. Pac. R.R., 352 U.S. 500, 506 (1957). "This low and liberal standard, combined with the applicable principle of comparative negligence that does not bar recovery on grounds of contributory negligence or assumption of risk by the plaintiff in Jones Act cases . . . works in favor of submission of issues to the jury in such cases . . . ." Diebold, 805 F.2d at 58 (citations omitted).

Bearing these guiding principles in mind, the court finds that there are disputed material issues of fact that cannot be resolved at the summary judgment stage and must therefore be submitted to the trier of fact. On the record before the court, a reasonable jury may find negligence on the part of Juliussen. However, the question remains whether such a jury could also find the existence of any negligence on the part of Buchanan.

The court first addresses whether Buchanan has breached its duty to provide a reasonably safe workplace under the Jones Act by, while on notice, removing the B One stairwell's original bulb,

installing a nightlight in its place creating a darkened condition, and then failing to replace the nightlight with a brighter alternative.

Conflicting evidence and testimony exists as to whether Buchanan's removal of the fluorescent light bulb and substitute installation of the nightlight constituted a breach of its duty. Defendant asserts that the B One stairwell's conditions "are exactly what a seaman would ordinarily and reasonably expect to find in a stairway on a tugboat like the [B] One," (Def.'s Mem. 12) highlighting Plaintiff's admission that the stairs are "typical of those found on tugboats." (Def.'s Summ. J. Ex. C, Juliussen Dep. 131.) But, in context, Plaintiff's admission arises in a dialogue on the stairwell's narrow design, and not necessarily in regard to the stairwell's lighting or treads. Elsewhere in his deposition, Juliussen testified that the stairwell's conditions were dark, insufficiently outfitted and maintained to prevent slip hazards, and that such conditions proximately caused his fall and injuries. (Id. 54-56, 133-37). Beyond conclusory statements that the stairwell was "safe and reasonably fit," Defendant has put forth no additional evidence indicating that a nightlight is reasonable substitute lighting for a tugboat's stairwell, and that no dangerous condition existed on the B One. Thus Defendant's evidence is not so one-sided that no question of fact remains. Anderson, 477 U.S. at 251-52. Plaintiff, on the other hand, has

27

set forth sworn testimony that the stair treads were worn and that the stairwell was dark and inadequately lit. (Def.'s Summ. J. Ex. C, Juliussen Dep. 54-57, 133-37, 139, 145-46.)  In addition, Juliussen submitted his Supplemental Accident Report, which indicates that "the stairs have no light, it was dark and the stairs are painted black." (Pl.'s Ex. 4, Supplemental Accident Report 1.)  Accepting Juliussen's testimony and evidence as true and drawing all factual inferences in his favor, the court finds that a genuine issue of material fact remains as to whether the stairwell's darkened condition in fact constituted an unreasonably dangerous condition, and that a question therefore exists as to whether Buchanan breached its duty to provide a reasonably safe workplace.

Second, under the relaxed causation standard applicable to Jones Act cases, there is also a question of material fact as to whether the darkened stairwell contributed in any way to Juliussen's fall and injuries.  Even assuming, *arguendo*, that Juliussen was negligent in his approach to descending the stairs, Plaintiff has presented evidence, including his sworn testimony and Supplemental Accident Report, that the stairwell's darkened condition played some role in his accident.  Thus a reasonable jury may plausibly find that the stairwell's condition and lack of adequate lighting played some part in causing Juliussen's accident and injuries, even if only the slightest.  Given the existence of

28

such a lingering factual question, the court must allow a jury to weigh the evidence to determine whether the stairwell's condition played any part in causing Plaintiff's injuries.

Accordingly, Defendant's Motion for Summary Judgment as to the negligence claim under the Jones Act is hereby DENIED.

## II. Unseaworthiness Under General Maritime Law

Buchanan also moves to dismiss Plaintiff's claim for unseaworthiness under general maritime law. For the reasons explained below, Defendant's Motion for Summary Judgment with regard to the unseaworthiness action is also DENIED.

As with the Jones Act negligence claim, the issue for the court to decide is whether Buchanan is entitled to judgment as a matter of law, or whether any specific factual questions present a genuine issue for trial. Celotex Corp., 477 U.S. at 325-27. Specifically, the court must determine whether any genuine material fact issues exist as to Defendant's alleged breach of its duty under general maritime law to provide and maintain a reasonably seaworthy vessel, and whether such breach played a substantial part in causing Plaintiff's injuries.

As a matter of law, a ship owner is strictly liable for personal injuries caused by his or her vessel's "unseaworthiness." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960). A shipowner has "a duty [] to furnish a vessel and appurtenances reasonably fit for their intended use." Id. at 550. "A ship is

considered to be unseaworthy when it is 'insufficiently or defectively equipped.'" <u>Oxley</u>, 923 F.2d at 25 (2d Cir. 1991) (quoting <u>Waldron v. Moore-McCormack Lines, Inc.</u>, 386 U.S. 724, 726 (1967)); <u>see also</u> <u>Usner v. Luckenbach Overseas Corp.</u>, 400 U.S. 494, 499 (1971). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." <u>Mitchell</u>, 362 U.S. at 550.[26]

---

[26] The Court of Appeals has noted, however, that "liability based upon unseaworthiness is wholly distinct from liability based upon negligence." <u>Oxley</u>, 923 F.2d at 24 (citation and quotation marks omitted), but the Court has yet to establish what level of causation is required for unseaworthiness claims. District courts in this circuit are divided on this issue. <u>Compare</u> <u>Milos v. Sea-Land Serv., Inc.</u>, 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979) (ruling that the causation requirement for an unseaworthiness action was the same standard as under the Jones Act) <u>with</u> <u>Saleh v. United States</u>, 849 F. Supp. 886, 895 (S.D.N.Y. 1994) (distinguishing causation standards and instantiating a "substantial" part standard for unseaworthiness claims). In an unseaworthiness claim under general maritime law, the <u>Saleh</u> court found proximate cause to mean: "1) that the unseaworthiness played a substantial part in bringing about or actually causing the injury; and 2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." <u>Id.</u> (citations omitted). Several district courts have followed <u>Saleh</u>. <u>See, e.g.</u>, <u>Lisowski v. Reinauer Transp. Co.</u>, No. 03-CV-5396 (NGG), 2009 WL 763602, at * 13-14 (E.D.N.Y. Mar. 23, 2009) (discussing distinct standards and applying substantial factor requirement to unseaworthiness claim); <u>see also</u> <u>Sadler v. Moran Towing Corp.</u>, 204 F. Supp. 2d 695, 697 (S.D.N.Y. 2002) (noting the stricter standard of causation for unseaworthiness than for a Jones Act negligence action); <u>Nasser v. CSX Lines, LLC</u>, 191 F. Supp. 2d 307, 315 (E.D.N.Y. 2002) (following <u>Saleh</u>); <u>Brown v. OMI Corp.</u>, 863 F. Supp. 169, 170 (S.D.N.Y. 1994) (applying the "substantial factor" causation standard to unseaworthiness claim); <u>see also</u> 1 Thomas J. Schoenbaum, <u>Admiralty & Maritime Law</u>

## A. Parties' Arguments

Similar to its Jones Act arguments, Buchanan maintains that the B One stairway "was and continues to be fit for its intended purpose of allowing seamen to move safely between elevations on the tug," and that the stairway is "typical of [that] on any seaworthy tugboat." (Def.'s Mem. 18.) Defendant further argues that, because Plaintiff's own negligence was the sole proximate cause of his injuries, Buchanan cannot be held liable for Plaintiff's injuries even if the vessel is deemed unseaworthy. (Id. 19.)

Plaintiff responds that a reasonable jury could conclude that the B One's darkened stairwell rendered the vessel unseaworthy, and that a genuine issue of material fact remains as to whether the stairwell's darkened condition played a substantial part in causing Juliussen's injuries. In support of his arguments, Plaintiff gave sworn deposition testimony that the substitute installation of a nightlight and the worn condition of the stair treads were proximate causes of his fall and injuries. (Def.'s Summ. J. Ex. C, Juliussen Dep. 54-56, 133-37.)

## B. Analysis

The court agrees with Plaintiff and finds that genuine issues

---

§ 6-25 & n.28 (4th Ed. 2004 & Supp. 2009) (citing Saleh and asserting that "[t]he standard of causation for unseaworthiness is more strict than for a Jones Act claim of negligence."). This issue need not be resolved here because, as the court will explain below, Juliussen survives summary judgment even under Saleh's heightened standard of causation.

of material fact exist as to: (1) whether the conditions of the B One's stairwell constituted deficient equipment rendering the vessel unseaworthy, and (2) whether the conditions of the stairwell played a substantial part in causing Juliussen's injuries.

First, a question of material fact exists as to whether Buchanan breached its duty to provide a seaworthy vessel. Juliussen testified that the stairs constituted a slip hazard and that the nightlight installed provided inadequate lighting. Accepting Plaintiff's testimony as true, the court finds a genuine issue of fact as to whether these stairwell conditions constituted deficient equipment rendering the vessel not reasonably fit, and thus whether Buchanan breached its duty under general maritime law.

The court also finds a disputed issue of material fact regarding the question of causation. As with the Jones Act claim, a reasonable jury could find some negligence on Juliussen's part based on the evidentiary record. However, again, Juliussen testified and submitted supporting evidence that the deficient lighting and dark condition of the stairwell proximately caused his accident and injuries. Whether Juliussen's fall was caused by his own negligence entirely, or whether the darkened stairwell condition played a substantial part in causing his injuries, is a genuine issue of material fact that must be left for the jury to decide.

Accordingly, Defendant's Motion for Summary Judgment as to the

unseaworthiness action is hereby DENIED.

## III. The Primary Duty Doctrine

Finally, Buchanan would apply the primary duty rule to bar both Plaintiff's claims. For the reasons explained below, the court finds that disputed issues of fact preclude application of the primary duty rule at this stage of the litigation, and therefor DENIES Defendant's summary judgment motion.

The primary duty or _Walker_ doctrine originates from Judge Learned Hand's opinion in _Walker v. Lykes Bros. S.S._, 193 F.2d 772 (2d Cir. 1952). Under this rule, an employee cannot recover for injuries caused by his own breach of "a duty which the injured person has consciously assumed as a term of his employment." _Id._ at 773. Accordingly, if applicable, the primary duty doctrine acts as an absolute bar to a seaman's recovery under the Jones Act. _Id._

The plaintiff in _Walker_, the master of a ship owned by his employer, sustained a shin injury caused by a steel cabinet drawer with faulty catches that dislodged when the ship rolled. _Id._ at 773. Prior to his injury, the plaintiff knew about the cabinet's defect but had done nothing to fix it. _Id._ The court reasoned:

> [I]t is well settled that the "duty of the master in the case of damage to the ship is to do all that can be done towards bringing the adventure to a successful termination; to repair the ship, if there be a reasonable prospect of doing so at an expense not ruinous;" just as it is his duty to care for the cargo, or not to overload the ship. Thus, if the plaintiff failed to repair the catches, although he was able to do so, his failure was . . . a breach of his duty to the defendant which barred his recovery absolutely.

33

Id. at 774 (footnotes omitted).

However, the doctrine's continuing viability has been questioned; it is unclear whether Walker is still good law in the Second Circuit. See Dunbar v. Henry DuBois' Sons Co., 275 F.2d 304, 306 (2d Cir. 1960) (two of three judges on the Court of Appeals panel expressly rejecting the Walker doctrine as "incompatible with the congressional mandate that contributory negligence and assumption of risk shall not bar recovery in a Jones Act case."); see also McSpirit v. Great Lakes Int'l, 882 F. Supp. 1430, 1432 (S.D.N.Y. 1995) (noting that "Walker's continued viability is doubtful").

Despite such uncertainty, district courts in the Circuit have continued to address and apply Walker when appropriate,[27] some

---

[27] See, e.g., Modlin v. McAllister Bros., No. 00 Civ. 517 (GBD), 2004 U.S. Dist. LEXIS 13374, at *9-14 (S.D.N.Y. July 15, 2004) (applying Walker to plaintiff whose hand became caught between the engine compressor's belt and the pulley system because "[a]s the sole chief engineer of the sea vessel, plaintiff had expertise and knowledge of the engine room . . . . [Plaintiff] was hired as a licensed chief engineer with a duty to notify and take corrective action when faced with a known dangerous condition . . . . [The evidence demonstrates that] plaintiff had been injured by a dangerous condition that he controlled and could have protected against."); Webster v. United States, No. 92 Civ. 8037 (BN), 1995 U.S. Dist. LEXIS 8499, at *18 (S.D.N.Y. June 20, 1995) (applying the primary duty doctrine when "the console panel was leaned against the binocular box in an unsafe or negligent manner by [plaintiff] creating an unsafe work place, since such unsafe condition was self-directed and created solely by [plaintiff's] own negligent handling of the panel on a seaworthy vessel").

grudgingly so.[28] Similarly, as <u>Walker</u> has not been overruled by the Court of Appeals *en banc,* nor adjudicated by the Supreme Court, this court must address the application of the 1952 Hand decision.

## A. Parties' Arguments

According to Buchanan, Juliussen "had a duty to maintain safe conditions on the [B] One, knew of the alleged unsafe conditions,

---

[28] <u>See, e.g.,</u> <u>Borges v. Seabulk Int'l, Inc.</u>, 456 F. Supp. 2d 387, 392-93 (D. Conn. 2006) ("the court notes the questionable continued validity of the <u>Walker</u> doctrine in this Circuit"; in any event, the doctrine did not apply to bar the action as "[t]here is a genuine issue of material fact as to whether the plaintiff's consciously assumed duty, as the seaman primarily responsible for safety on the ship, extended to furnishing the vessel with specific equipment that the owner had not supplied despite repeated requests."); <u>Lombas</u>, 899 F. Supp. at 1096-97 (although in dicta, "the court notes that the [<u>Walker</u>] doctrine is of questionable viability in this Circuit" and finds the facts of the case, involving an employee who was injured when negligently dragging a cable backward across a ship, distinguishable from <u>Walker</u>); <u>McSpirit</u>, 882 F. Supp. at 1432-33 ("other Circuits have continued to chip away at the core of <u>Walker</u>"; <u>Walker</u> was inapplicable to the case because, unlike <u>Walker</u>, "the condition found by the jury to have been the result of negligence existed for a substantial period before the voyage on which [plaintiff] was injured" and it was "undisputed that other high ranking employees of [the shipowner employer] knew about the [dangerous condition]"); <u>Saleeby v. Kingsway Tankers, Inc.</u>, 531 F. Supp. 879, 881 (S.D.N.Y. 1981) (noting that <u>Walker</u> "although to date not overruled, has repeatedly been unavailing to defendants in our Circuit's Court of Appeals"; holding that plaintiff did not breach his duty to his employer when, after notifying the Captain of a broken freezer and the parts were requisitioned, plaintiff slipped and fell while trying to keep it operational). <u>McSpirit</u> recognized that the Seventh Circuit's <u>Kelley</u> opinion "essentially reduced <u>Walker</u> to a comparative negligence case by reading <u>Walker</u> as doing no more than expressing the unremarkable notion that a finding of 'no negligence on the part of the employer' prevents a plaintiff from recovering." <u>McSpirit</u>, 882 F. Supp. at 1432 (citing <u>Kelley v. Sun Transp. Co.</u>, 900 F.2d 1027, 1031 (7th Cir. 1990)).

failed to remedy or do anything at all about them and was eventually injured by them as alleged." (Def.'s Mem. 20.) Because Juliussen admits "he was responsible for preventing and correcting the existence of any potentially hazardous condition on the vessel" and because "he was well aware of the conditions in the stairwell which did not change over the four years leading up to his accident," Defendant claims that Plaintiff breached his "duty to correct" these conditions "by knowingly failing to do anything at all about the alleged conditions." (Pl.'s Mem. 11.) To the extent that such conditions existed, Defendant argues, "it was this breach that was the sole proximate cause of Juliussen's injury." (Id.) Lastly, Defendant adds that Plaintiff had a "duty to comply with and enforce the company safety policy against wearing sneakers," which he also breached, and that such breach "likely contributed to his fall." (Id. 21.)

Juliussen disputes the applicability of the primary duty rule. He argues that, in any event, the application of this doctrine is inappropriate at the summary judgment stage because questions of fact remain. (Pl.'s Mem. 11.) Juliussen asserts that genuine issues of material fact exist for trial as to (1) whether Plaintiff's duty as Buchanan's employee "extended to furnishing the [B One] with specific equipment that the owner had not supplied" and (2) whether Plaintiff's injuries were caused by Defendant's breach of its own duty to provide a safe workplace. (Id.)

36

Plaintiff also argues that "[he] did not fail to perform a duty which he had consciously assumed as a term of his employment," claiming that he assumed no duty to perform maintenance or repairs of the vessel. (Id.) He maintains, instead, that such duty rested with Defendant. (Id.) Plaintiff submitted testimony that while "it was [his] practice to report any unsafe condition onboard the tugboat to the Captain upon becoming aware of [it]," "correct[ing] promptly the existence of all potentially hazardous conditions" was not a Mate's specified duty and responsibility. (Pl.'s Ex. 3, Admis. ¶¶ 14, 15.) Plaintiff further maintains that he "did not control the dangerous condition," i.e., the lack of adequate lighting in the B One's stairwell, and that he did "in fact, complain about and report the dangerous condition of inadequate lighting and the dangerous passageway created thereby to Captain Moriarty on multiple occasions," satisfying his duties as Mate. (Pl.'s Mem. 12.)

**B. Analysis**

Because there is a genuine issue of material fact regarding Juliussen's primary duties as Mate on the B One, the court cannot determine as a matter of law that Juliussen breached such duties so as to render applicable the primary duty rule.

Plaintiff does not dispute Defendant's assertion that Juliussen "[w]hile on watch as a Mate on the [B] One [] is the master of the vessel and [] is responsible for the safety of the

entire crew." (Statement of Material Facts on Def.'s Mot. for Summ. J. 6.)  Yet while the record evidence shows that Juliussen was in fact "responsible for the safety of the entire crew" while on watch as Mate of the B One, factual uncertainty remains as to the extent of Juliussen's responsibilities.  Additional facts are required to determine whether Juliussen's responsibility for the crew's safety required him to do more than just speak with the Captain "in passing" on "numerous" occasions about the darkened stairwell's condition.  The legal determination as to whether the primary duty rule may apply is premised on these factual issues.  Without the resolution of such issues, the court cannot find as a matter of law that Juliussen breached his primary duty. <u>See</u> <u>Bennett v. Progressive Corp.</u>, 225 F. Supp. 2d 190, 218-19 (N.D.N.Y. 2002) (requiring determination of factual questions as to nature and extent of plaintiff's work and primary duties, among other things, before making legal determination); <u>see also</u> <u>Fife v. Harmon</u>, 171 F.3d 1173, 1175-76 (8th Cir. 1999) (refusing to grant summary judgment due to factual discrepancies involving nature of and time spent on employee's duties); <u>Cooke v. Gen. Dynamics Corp.</u>, 993 F. Supp. 56, 60-64 (D. Conn. 1997) (finding factual discrepancies between employer and employee regarding what employee's primary duties were and whether employee's exercise of discretion and independent judgment precluded summary judgment); <u>McGrath v. City of Philadelphia</u>, 864 F. Supp. 466, 489 (E.D.Pa. 1994) (denying

summary judgment where factual dispute existed as to employee's primary duty).

Furthermore, the court cannot, as a matter of law, determine that Juliussen's own failure to fulfill his duties as Mate solely and proximately caused his injuries. As explained above in the discussion of the Jones Act negligence and unseaworthiness claims, there are genuine issues of material fact as to whether Buchanan's substitute installation of the nightlight played any part -- whether the slightest or substantial -- in causing Juliussen's injuries. Because these questions of material fact are unresolved, Defendant cannot establish, as a matter of law, that Juliussen's own knowing failure to carry out his responsibilities was the sole and proximate cause of his injuries.

Finally, a genuine material fact issue remains as to whether Juliussen's alleged breach of his duty to comply with Buchanan's workshoe policy contributed in any way to causing his injuries. Buchanan argues that Juliussen violated his duty to abide by the workshoe safety policy contained in the Policy Manual, and that such breach "likely contributed to his fall." (Def.'s Mem. 21.) Juliussen, on the other hand, claims that he was off duty, and therefore was not obligated to wear a leather work boot with a non-slip, oil-resistant sole. (Pl.'s Mem. 3.)

Assuming, *arguendo*, that Juliussen did in fact breach his duty to comply with Buchanan's workshoe policy by wearing sneakers, a

disputed issue of material fact exists as to causation. Buchanan's conclusory statement that Juliussen's breach of such duty "likely contributed to his fall" is insufficient to establish that Juliussen's decision to wear sneakers proximately caused his accident and injuries. Juliussen submitted sworn testimony that he, and others, believed a sneaker is more slip-resistant than the work boot required by Buchanan's policy. (Pl.'s Ex. 1, Juliussen Dep. 193-94.) Such evidence therefore presents a genuine factual question as to what extent, if any at all, the sneakers contributed to Juliussen's slip and fall. As such, the court must allow the fact-finder to determine the level of causation played by Juliussen's alleged failure to comply with Buchanan's workshoe policy.

## CONCLUSION

Therefore, in accordance with the court's analysis and determinations above, the court hereby DENIES Defendant's Motion for Summary Judgment in its entirety.

The parties are directed to consult and, by February 8, 2010, submit, for the court's consideration, an order governing preparation for trial.

It is SO ORDERED.

Donald C. Pogue, Judge

Dated:     January 6, 2010
           New York, New York